James E. Holland, Jr. (021826)
Javier Torres (032397)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email:  james.holland@stinson.com
         javier.torres@stinson.com
Attorneys for HKB, Inc., dba Southwest Industrial Rigging

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| HKB, INC., an Arizona corporation, doing business as SOUTHWEST INDUSTRIAL RIGGING, <br><br>Plaintiffs, <br><br>v. <br><br>BOARD OF TRUSTEES FOR THE SOUTHWEST CARPENTER'S SOUTHWEST TRUST; CARPENTERS SOUTHWEST ADMINISTRATIVE CORP., <br><br>Defendants. | No. 2:16-cv-03799 <br><br>**OPPOSITION TO MOTION TO DISMISS OR STAY THE ACTION** <br><br>Assigned to the Honorable Diane J. Humetawa |

Plaintiff HKB, Inc., dba Southwest Industrial Rigging's ("Southwest") claim should proceed in this Court against defendants Board of Trustees for the Southwest Carpenter's Southwest Trust and Carpenters Southwest Administrative Corp. (collectively, "the Trusts"). The Trusts' forum-selection clause is unenforceable because it is contrary to Arizona's public policy. Moreover, the forum-selection clause cannot be enforced against Southwest because the ex-employee who purportedly signed the Memorandum on Southwest's behalf lacked authority to do so, and everyone knew it. The Trusts incorrectly claim that "first to file" mandates dismissal; in reality first-to-file is merely one factor (and a relatively insignificant one at that) when deciding which venue is most appropriate. The Trusts' argument that the union is an indispensable party is wrong because the union has already assigned all of its rights to the Trusts, so it has no remaining interest in this lawsuit. Finally, the Trusts misstate the test for preemption

CORE/3008422.0002/130519316.4

under NLRA Section 301. Southwest's claims are not preempted because they do not exclusively arise under state law and Southwest's claims are not at odds with federal law. In short, Arizona is the proper venue for this dispute, and Southwest states valid claims against the Trusts, so the Court should deny the Trusts' motion.

**1.    The Trusts seek to impose obligations that Southwest never agreed to.**

Southwest performs construction-related maintenance and repair work at the Palo Verde Nuclear Generating Station just west of Phoenix (the "Power Plant") twice a year for 4-6 weeks at a time.[1] Southwest had previously used carpenters provided by the Construction Union to supplement its workforce for the maintenance and repair work at the Power Plant, but Southwest was never required to sign a long-term union contract.[2] Rather, Southwest simply employed the individual Construction Union members on a piecemeal basis, paying the carpenters (and the Funds) for the work actually performed, but having no obligation beyond the temporary work provided at the Power Plant.[3]

In mid-2013, Tom Allen, a salesman for Southwest, told his supervisors at Southwest that the Union gave him a document titled "Southwest Regional Council of Carpenters – Carpenters Memorandum 2012-2016" (the "Memorandum"), which the Union wanted Allen to sign on Southwest's behalf.[4] Allen was only a salesman for Southwest, so the Union had no reason to believe that Allen was authorized to sign the Memorandum. Allen had no experience with such documents, had no authority to sign such documents, and had never seen such documents, so he asked his supervisors for direction.[5] His supervisors told him he did not have authority to enter such contracts, and indeed Southwest would not agree to the Memorandum.[6] Moreover, Southwest could not evaluate the issue further because the Memorandum referenced several other

---

[1] *See* Exhibit 1, Declaration of James Douglas Wilson ("Wilson Decl."), ¶ 3.
[2] Wilson Decl. ¶ 4.
[3] Wilson Decl. ¶ 5.
[4] Wilson Decl. ¶ 6.
[5] Wilson Decl. ¶ 7.
[6] Wilson Decl. ¶ 8.

CORE/3008422.0002/130519316.4

1 documents that Southwest had never seen and did not have access to.[7]

2  Despite having been explicitly told that Southwest would not agree to the
3 Memorandum and that he did not have authority to sign the Memorandum, Allen
4 apparently signed the Memorandum on August 22, 2013. As part of the signing process,
5 Allen was to state his name and corporate title to ensure he had actual authority to bind
6 Southwest. Allen correctly identified himself merely as a salesman:
7 *TomAllen   Sales*.[8] The Construction Union obviously knew that a salesman
8 would not have authority to sign a long-term union contract, particularly one that (as
9 will be seen) potentially creates a multi-million-dollar exposure based upon the union-
10 workers' piecemeal temporary work. To create the impression that Allen had authority
11 to sign the Memorandum, Allen was required to sign another copy of the Memorandum,
12 identifying him (in different handwriting) more broadly as a company representative:
13 *Tom Allen – Local Rep.*.[9] Southwest conducts its business almost exclusively in Arizona,
14 so "Local Rep" is not a title Southwest used or recognized.[10]

15  Subsequent to Allen's signing of the Memorandum, and still unaware that Allen
16 had signed the Memorandum, Southwest reiterated to Allen that he did not have
17 authority to bind Plaintiff by signing such contracts on Plaintiff's behalf.[11] In the
18 meantime, while still unaware that Allen had signed the Memorandum, Southwest used
19 Construction Union carpenters to perform temp work at the Power Plant, just as it had
20 been doing for years. Consistent with past practices, Southwest paid for all services
21 rendered by the union carpenters, including paying the plaintiff Funds based upon work
22 performed by the union carpenters.[12]

23  Beginning November 2015—several years after Southwest first began hiring and
24 paying for services provided by the Construction Union's carpenters (and more than two

---

[7] Wilson Decl. ¶ 9.
[8] Wilson Decl. ¶ 10; Ex. A to Wilson Decl.
[9] Wilson Decl. ¶ 11; Motion, Ex. 1 to Shanley Decl. at Page 008.
[10] Wilson Decl. ¶ 12.
[11] Wilson Decl. ¶ 13.
[12] Wilson Decl. ¶ 14.

CORE/3008422.0002/130519316.4

years after Allen signed the Memorandum)—the Funds purported to perform an "audit" regarding Southwest's payments to the Funds. As a result of the "audit," the Funds demanded that Southwest make additional payments in excess of $490,000, for various health-care, training, vacation, and pension funds. This payment demand was not based upon any work performed by the Construction Union's carpenters. Rather, the Funds demanded payment solely based upon services *performed by Southwest's own employees*. Southwest's employees are not members of and have no affiliation with the Construction Union. Nevertheless, the Funds claimed one of the documents incorporated into the Memorandum says Southwest must pay the Funds for all work performed by Southwest's employees even though they are not union members and do not receive union benefits.[13] In other words, the Funds claim that because Southwest hired union carpenters for temporary work at the Power Plant, Southwest is required to pay the Funds for all work performed year-round by Southwest's non-union employees.

The Funds' demand by itself actually exceeds the value of all services provided by the union carpenters for that time period.[14] Neither Southwest nor Southwest's employees will receive any benefit from the health-care, training, pension, and vacation plans that the Funds claim Southwest must pay for. During the time that Southwest used carpenters provided by the Construction Union, neither the Construction Union nor the Funds ever brought to Southwest's attention any expectation that Southwest was liable for any of the payments that Funds ultimately demanded as a result of the "audits."[15]

**2.      Southwest never accepted the Trusts' forum-selection clause.**

The Trusts rely on forum-selection clauses which are not found in the Memorandum itself, but which are instead buried deep within Trust documents which, according to the Trusts, are incorporated by reference into the Memorandum.[16] According to The Trusts, these clauses mandate that litigation be conducted in Los

---

[13] Wilson Decl. ¶ 15.
[14] Wilson Decl. ¶ 16.
[15] Wilson Decl. ¶ 17.
[16] Motion at 2.

CORE/3008422.0002/130519316.4

4

1 Angeles, California.[17] But Allen was not authorized to sign the Memorandum.[18] Equally
2 important, the Construction Union knew or should have known that Allen did not have
3 authority to bind Southwest to the Memorandum.

4 Moreover, Southwest did not ratify Allen's unauthorized act in signing the
5 Memorandum. The Memorandum does not create enforceable rights for the union
6 carpenters hired by Southwest. Rather, the Memorandum only purports to set terms of
7 employment—if (and only if) Southwest decided to hire union carpenters. After
8 Southwest was alerted that the Funds believed Southwest had agreed to the
9 Memorandum, Southwest immediately stopped hiring Union carpenters.[19] Since
10 Southwest never agreed to be bound by the Memorandum, it follows that Southwest is
11 not bound by a venue provision buried in a document referenced by the Memorandum.

12 In its Motion, the Trust incorrectly argues that Southwest's managers "signed up
13 for a separate program to participate in the benefit plans based upon the agreement by
14 Mr. Allen."[20] The Trust never explains how this is relevant to the motion, but far more
15 important, the allegation is blatantly false. Neither Southwest nor its managers ever
16 signed up for such a program, nor were any of them aware the Trusts purported to offer
17 such a program. Indeed, the Trusts' allegation is based exclusively on the fact that
18 Southwest submitted a one-page form saying its managers were "exempt from . . .
19 reporting requirements" to the Trusts (see Ex. 9). Contrary to the Trusts' allegations,
20 that one-page form simply addresses exemptions from reporting requirements; it does
21 not "sign up" anyone for anything. Indeed, it does not mention eligibility for benefits
22 programs, nor does it even mention that such programs exist. If Southwest's employees
23 did actually qualify for a "benefit plan," as alleged by the Trusts, that would have
24 happened through some other document, and the Trust does not argue otherwise.
25 Indeed, the Trusts' administrator merely said that the exempt employees qualify for

---

[17] *Id.*
[18] Wilson Decl. ¶ 8, 10, 11, 12, 14.
[19] Wilson Decl. ¶ 18.
[20] Motion p. 3.

CORE/3008422.0002/130519316.4

5

benefits, not that Southwest "signed up" for those benefits. Southwest never knew the union purported to offer a "benefit plan" for company managers; Southwest never knew the managers would be deemed to be eligible for such benefits; and Southwest did not want the purported benefit plan.[21] For their part, Southwest's managers never actually received any such purported benefits, never knew they were deemed to be eligible to receive any purported benefits and never knew such benefits existed.[22]

Finally, even if the exemption form did "sign up" employees for benefits (it did not), there is still no evidence that Southwest accepted those benefits. As the form plainly states, the Southwest employee who signed the form was merely an administrative assistant who worked in payroll—not someone with any authority to bind Southwest to the Trust's purported contract. Thus, the Trust's argument that Southwest "signed up for a program allowing its managers to participate in the SWRCC sponsored benefits plans" is intentionally misleading and patently false.

**3.     The Trusts' forum-selection clause violates Arizona public policy.**

Even if Southwest is bound by the Memorandum (it is not), Southwest is still is not subject to suit in California because the venue-selection provision is invalid. As a matter of public policy, the Arizona legislature has declared that every covenant or understanding that is "collateral to or affect[s] a construction contract" must be litigated in Arizona:

> A. The following are *against this state's public policy* and are *void* and *unenforceable*:
>
> 1. A provision, covenant, clause or understanding in, collateral to or affecting a construction contract that makes the contract subject to the laws of another state or that requires *any litigation* arising from the contract to be *conducted in another state.*
>
> . . .
>
> B. Any mediation, arbitration or other *dispute resolution proceeding* arising from a construction contract for work performed in this state

---

[21] *See* Wilson Decl. ¶ 19.
[22] *See* Wilson Decl. ¶ 20, 21.
CORE/3008422.0002/130519316.4

6

***shall be conducted in this state***.[23]

As discussed above, the only reason Southwest hired the Union carpenters was to provide construction services for the Palo Verde power plant in Arizona. Indeed, the Trust admits in its Complaint in the California action that Southwest was "a contractor engaged in the ***construction*** industry"[24] and Southwest "engaged [union] workers . . . [to] perform[ ]  labor on ***works of construction*** . . . [under] the term of the [Memorandum]."[25] In other words, as alleged in the California Complaint, the Memorandum either constitutes a construction contract or, at a minimum, the Memorandum is "collateral to or affect[s] a construction contract" under A.R.S. § 32-1195(A)(1). Thus, the Memorandum's purported venue provision—purportedly requiring litigation in California—violates public policy and is invalid under Arizona law. More importantly, because construction work was performed in Arizona, all "dispute resolution proceeding[s]," including this litigation, must be in Arizona.[26]

**4.    The first-to-file rule must yield to the fact that Arizona is the most convenient and suitable forum.**

The Funds claim that this Court cannot decide this case because they filed a lawsuit in California based upon the same underlying facts. That lawsuit was filed October 28, 2016[27] while this lawsuit was filed November 2, 2016.[28] But while the Funds may have beaten Southwest to the punch (by a mere five days), Southwest was

---

[23] A.R.S. § 32-1195(A)(1) (emphasis added).
[24] *See Carpenters Southwest Admin. Corp. v. H K B Inc. et al*, 2:16-cv-08040-MWF-SK (C.D. Cal.), Dkt. No. 1 (hereinafter "California Complaint"), ¶ 13 (emphasis added).
[25] California Complaint, ¶ 20 (emphasis added).
[26] *See, e.g., Keystone, Inc. v. Triad Systems Corp.*, 292 Mont. 229, 235 (1998) (state statute "invalidate[d] forum selection clauses that would have the effect of forcing Montana residents to litigate disputes outside of Montana," holding that "provision at issue which requires that a Montana resident arbitrate disputes related to a contract to be performed in Montana at a location outside Montana is void because it violates Montana law."); *see also Jones v. GNC Franchising*, 211 F.3d 495, 498 (9th Cir. 2000); *Ida. Pac. Corp. v. Binex Line Corp.*, 2016 WL 843254 *11 (D. Ida. 2016); *Jacobsen Const. Co., Inc. v. Teton Builders*, 106 P.3d 719, 725-26 (Utah 2005).
[27] *Carpenters Southwest Admin. Corp. v. H K B Inc. et al*, 2:16-cv-08040-MWF-SK (C.D. Cal.), Dkt. No. 1 (complaint filed in California action on October 28, 2016) (hereinafter "California Complaint").
[28] Dkt. 1.

1  the first to bestow this Court with jurisdiction over the parties to this suit. Indeed, the
2  Trusts never even tried to contact Southwest about litigation until after Southwest had
3  served them with the summons from this Court, and the Funds never tried to serve
4  Southwest with the California summons until 11 days after the Funds had been served
5  with the summons from this Court.

6  The first-to-file rule is not an absolute rule, stripping courts of the ability to use
7  common sense. Although "a plaintiff's choice of forum is entitled to deference, this is
8  not the case . . . when . . . the operative facts have not occurred within the forum [or] the
9  forum has no particular interest in the action."[29] Even in ERISA cases, courts will
10 transfer venue when the plaintiff's choice of forum "lack[s] any significant contact with
11 the underlying cause of action."[30] Courts are empowered and expected to consider the
12 factors used in a traditional transfer motion, including convenience and suitability of the
13 competing forums.[31] All of these factors weigh in favor of keeping this suit in Arizona.

14 By statute, venue should be selected based upon "the convenience of parties and
15 witnesses in the interest of justice."[32] The purpose of the statute is "to prevent the waste
16 of time, energy, and money and to protect litigants, witnesses and the public against
17 unnecessary inconvenience and expense."[33] Those purposes are far-better met by
18 litigating in Arizona than in California. The court must consider the following three
19 factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3)
20 the interests of justice.[34] In analyzing the third factor, the "interests of justice," a
21 number of factors are relevant, including: (1) the location where the relevant agreements

---

[29] *Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1146 (C.D. Cal. 2009) (punctuation modified); *see also Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968); *F.T.C. v. Wright*, 2:13-CV-2215-HRH, 2014 WL 1385111, at *2 (D. Ariz. Apr. 9, 2014) (collecting cases).
[30] *Hanley v. Omarc, Inc.*, 6 F. Supp. 2d 770, 775 (N.D. Ill. 1998).
[31] *See, e.g., Micron Tech., Inc. v. MOSAID Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008).
[32] 28 U.S.C. § 1404(a).
[33] *Saleh v. Titan Corp., et al.*, 361 F.Supp.2d 1152 (S.D. Cal. 2005).
[34] 28 U.S.C. § 1404(a).

CORE/3008422.0002/130519316.4

were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiffs choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiffs cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.[35] Virtually all of these factors compel the same result: the District of Arizona.

### A. Venue is proper in Arizona.

Any litigation relating to this matter could – and should — take place in Arizona. For ERISA claims, venue is proper in the district court in any of four locations: (1) where the plan is administered; (2) where the breach took place; (3) where a defendant resides; or (4) where a defendant may be found.[36] Three of those four alternatives point to Arizona. Southwest employed—and allegedly failed to pay—the union members in Arizona for services that they provided in Arizona. All of the Trusts reside in Arizona, and they can all be found here. Thus, venue in the District of Arizona is clearly proper.

### B. The parties' convenience weighs in favor this District, not California.

The parties' convenience weighs heavily in favor of this District: Southwest's principal place of business is in Phoenix, and Southwest has no offices, facilities, or personnel in California.[37] In fact, Southwest's headquarters—located on McDowell and 27th Avenue—is just a stone's throw from the District of Arizona's courthouse. Southwest's three other offices are also located in Arizona—hundreds of miles east of the California border.[38] Thus, Arizona is obviously more convenient for Southwest.

The Funds, in contrast, were not signatories to the Memorandum, were not part of negotiating the Memorandum, and were not involved in performance of the work under the Memorandum. They are nothing more than third-party beneficiaries or

---

[35] *Szegedy v. Keystone Food Prod., Inc.*, 2009 WL 2767683 (C.D. Cal. 2009).
[36] 29 U.S.C. § 1132(e)(2).
[37] Wilson Decl. ¶ 22-27.
[38] Wilson Decl. ¶ 28.

CORE/3008422.0002/130519316.4

9

assignees of the Memorandum. Thus, they have no more rights than the Construction Union under the Memorandum.[39] Even so, the Funds likely have few, if any, party witnesses who reside in California. Equally important, it obviously is not inconvenient for the Funds to litigate in Arizona because the Construction Union is officed in Arizona with hundreds, if not thousands, of members in Arizona, so the Funds are already engaged in business in Arizona. Even more important, the Funds audited Southwest and asserted their claim while Southwest remained exclusively in Arizona, so Arizona does not constitute an inconvenient forum for the Funds.

Although they are not technically party to this lawsuit, it is also worth noting that the Funds sued three individuals in the California lawsuit based upon their status as managers of Southwest. Those three individuals reside and work exclusively in Arizona, and have no property, phone numbers, addresses, or other contacts with California.[40] In short they maintain virtually no contact with California under *International Shoe*[41] so as to have availed themselves of California jurisdiction under *Burger King*.[42]

### C. Convenience of the non-party witnesses weighs in favor of this District.

Many courts have wisely recognized that the convenience of the witnesses is the most important factor to consider in evaluating venue under 28 U.S.C. § 1404(a).[43] This factor points exclusively to Arizona. Tom Allen, the former Southwest employee who signed the Memorandum—and whose testimony will be crucial to this matter—resides in the Phoenix area.[44] Moreover, as part of their audit, the Funds identified *fifteen* Southwest employees whose pay the Funds disputed during their audit. All *fifteen* of these Southwest employees live in the Phoenix area.[45] Furthermore, eight of the twenty-four union members whose work gave rise to this claim reside in Arizona—more than

---

[39] *Schneider Moving & Storage Co. v. Robbins*, 446 U.S. 364, 370 (1983).
[40] Wilson Decl. ¶ 29-38.
[41] *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).
[42] *Burger King v. Rudzewicz*, 471 U.S. 462 (1985).
[43] *Rogers v. United States*, CV-15-08143-PCT-JZB, 2015 WL 8479065, at *4 (D. Ariz. Dec. 10, 2015) (collecting cases).
[44] Wilson Decl. ¶ 39.
[45] Wilson Decl. ¶ 40.

CORE/3008422.0002/130519316.4

1 any other state.[46] Thus, Arizona is a far more convenient forum for the non-party
2 witnesses.

### D. Public factors show that this District is the most suitable forum.

In addition to the private factors enumerated above, the court must consider the "public-interest factors and fairness that . . . come under the heading of 'the interests of justice.'"[47] These public-interest factors include such things as the local jurisdiction's interest in having localized issues decided at home and the forum's familiarity with the law that will govern the case.[48]

### 1. Arizona has a strong interest in deciding this case.

#### (a) All of the relevant events occurred in Arizona.

Arizona has a strong interest in deciding this case because all of the operative facts in this case occurred in Arizona, not California. Both Southwest and the Construction Union, which purportedly signed the Memorandum, are officed in Phoenix.[49] Southwest is an Arizona entity working almost exclusively in Arizona. The Construction Union maintains an office in Phoenix and has a long history of providing construction services for the Power Plant in Arizona. The Memorandum was purportedly signed by Tom Allen in Arizona.[50] And Southwest has never engaged the Construction Union to perform any work in California.[51] In fact, Southwest avoids California at all costs because it has oppressive employment and environmental regulations.[52] Indeed, only a small fraction of Southwest's heavy equipment could satisfy California's more stringent environmental standards.[53] For these reasons (among

---

[46] Wilson Decl. ¶ 41.
[47] *Langley v. Prudential Mortg. Capital Co.*, 546 F.3d 365, 370 (6th Cir.2008) (citation omitted).
[48] *In re Nintendo Co.*, 589 F.3d 1194, 1198 (Fed.Cir.2009); *Ravelo Monegro v. Rosa*, 211 F.3d 509, 512 (9th Cir.2000).
[49] The Construction Union has an office located at 4547 W. McDowell Rd., Phoenix, AZ 85035. See http://www.swcarpenters.org/src-offices/  This is approximately 5.5 miles from the District of Arizona's courthouse.
[50] Wilson Decl. ¶ 42.
[51] Wilson Decl. ¶ 43.
[52] Wilson Decl. ¶ 44.
[53] Wilson Decl. ¶ 45.

CORE/3008422.0002/130519316.4

others), Southwest does not work in California. Finally, nearly all of the material witnesses reside in Arizona, not California.[54]

The fact that the Funds choose to administer their accounts from California is of no significance, particularly since Southwest is purported to have contracted with the Construction Union, not the Funds, and Southwest had no role or choice regarding the location where the Funds chose to administer their program. Moreover, the Funds are operated for the benefit of Construction Union carpenters who reside and work in Arizona.[55] Indeed, it was their Memorandum that gave rise to this litigation.

(b) Arizona's public policy demands this case be decided in Arizona.

The fact that the Construction Union's work was performed in Arizona is also entitled to great weight. In fact, Arizona's legislature has declared as a matter of public policy that disputes arising from or collateral to a construction contract must be decided in Arizona, and contract clause that specifies a different forum is "against this state's public policy and are void and unenforceable."[56] To be clear, as part of that same public policy, every "dispute resolution proceeding arising from a construction contract for work performed in [Arizona] shall be conducted in [Arizona].[57] Arizona's public policy in this regarding is entitled to great weight.[58]

In contrast, California has no real interest in addressing this dispute. Nothing related to this Memorandum occurred in California, and Southwest never sought California workers—the union merely provided workers based on availability.[59] While Southwest focuses its business in Arizona, the Funds are in the business of reaching out to employers wherever the union gets work (including those in Arizona).[60] To the extent any activities occurred in California, they are related to collection and audit—events

---

[54] Wilson Decl. ¶ 40.
[55] Wilson Decl. ¶ 41.
[56] A.R.S. § 32-1195(A)(1) (emphasis added).
[57] A.R.S. § 32-1195(A)(1) (emphasis added).
[58] *In re LMI Legacy Holdings, Inc.*, 553 B.R. 235, 251 (2016).
[59] Wilson Decl. ¶ 46.
[60] Exhibits 3 to the California Complaint shows the Funds reached out to Southwest (in Arizona), not the other way around.

CORE/3008422.0002/130519316.4

which did not give rise to the alleged breach, but are instead incidental to the alleged breach committed in Arizona.

### 2. *This lawsuit is governed by Arizona law.*

Although The Trusts claim this dispute arises under ERISA,[61] ERISA principles are applied against a backdrop of Arizona law.[62] Significant here, Arizona law will govern questions of contract formation and whether the Funds' claims against Southwest are barred by the statute of limitation.[63] The Arizona legislature has said that all contracts "collateral to or affecting a construction contract" must be decided by Arizona law.[64] Indeed, the law makes any contractual choice-of-law provision void as against public policy.[65] And even without its statutory expression of public policy, Arizona has the greatest interest in applying its law to the facts alleged in this case.[66]

### 3. *Litigating in California will be more expensive than in Arizona.*

As discussed above, there are, at minimum, 25 Southwest employees and union workers whose testimony will likely be relevant who all reside in Arizona.[67] Litigating in California would require, at minimum, 25 people needlessly traveling to Los Angeles for trial. This factor weighs heavily in favor of the District of Arizona.

### 4. *The witnesses are within the subpoena power of the District of Arizona, but not the Central District of California.*

As discussed above, one of the key witnesses in this matter is Allen, the former Southwest employee who signed the Memorandum. His testimony would be highly relevant to issues of actual and apparent authority and would shed light on negotiations

---

[61] *See* Motion at 3.
[62] *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643, 646–47 (9th Cir. 2000) (courts look to "most analogous state statute" when "[t]here is no specific federal [ERISA] statute" on a given issue).
[63] *Blood Systems, Inc., v. Roesler*, 972 F. Supp. 2d 1150, 1156-57 (D. Ariz. 2013) (finding that ERISA claim was barred by Arizona's one-year statute of limitations for employment contracts). *See also Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000); *Adamson v. Armco, Inc.*, 44 F.3d 650, 652-54 (8th Cir.1995).
[64] A.R.S. § 32-1129.05.
[65] A.R.S. § 32-1129.05(a)(1).
[66] See Restatement (Second) Conflicts of Law § 188.
[67] Wilson Decl. ¶ 40, 41.

regarding the Memorandum. Because he resides in the Phoenix area[68] and is no longer with Southwest, he is not subject to California's subpoena power, so litigating in this District is absolutely crucial so Southwest can present its case at trial. The same is true with the other witnesses who reside in Arizona but whose testimony may be necessary.

     *5.     The documents are in Arizona, not California.*

As discussed above, Southwest does business almost exclusively in Arizona. All of its records are located in Arizona, not in California.

**5.     The Construction Union is not an indispensable party to this lawsuit.**

The Trusts are flat wrong to argue that the Construction Union is an indispensable party.[69] Although the Trusts do not explain their relationship to the Construction Union in their motion, they did explain their relationship in the California action—the Trusts are assignees of the Construction Union: "The duly authorized and acting trustees or directors of each of the PLANS have also assigned to CSAC all their right, title and interest in and to any and all amounts due and owing to the respective PLANS by the employer as herein alleged."[70] Thus, the Construction Union is merely an assignor of the "right, title and interest" at issue in this lawsuit. Courts across the country uniformly agree that assignors are not indispensable parties.[71] Indeed, if, as the Trusts admit, there has been a total assignment, the Construction Union is not even a *proper* party to this action.[72] The Trusts have no authority to argue otherwise. If the

---

[68] Wilson Decl. ¶ 39.
[69] Motion at 6-8.
[70] *See* California Complaint at 3.
[71] *See, e.g., CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, CV-14-00800-PHX-JAT, 2015 WL 2412154, at *2 (D. Ariz. May 20, 2015) ("Generally, an assignor is a necessary party only when the validity of the assignment itself is at issue, or when there only has been a partial assignment.") (internal quotations omitted); *R.C. Hedreen Co. v. Crow Tribal Hous. Auth.*, 521 F.Supp. 599, 608 (D.Mont.1981). Because the Construction Union assigned away its rights, the cases cited by the Trust regarding "signatories" and "parties" to a contract are inapposite.
[72] *See CIT Fin. LLC*, 2015 WL 2412154, at *2 ("Indeed, in most cases the assignor would not even be a proper party inasmuch as the assignor may have lost the right to bring an independent action on the contract by virtue of the assignment.")(quoting Wright & Miller, 7 Fed. Prac. & Proc. Civ. § 1613 (3d ed.)).

CORE/3008422.0002/130519316.4

Union really was an indispensable party in this action, it likewise is an indispensable party in the California action – yet the Trusts did not include it in its California action.[73]

The Trusts incorrectly argues that a ruling in this case could leave the Union without "benefit of various provisions, including having the members be hired through the hiring hall."[74] The Construction Union does not have an enforceable right to be hired by Southwest. Rather, the Memorandum merely purports to establish default contract terms if (and only if) Southwest chooses to hire union members. To that end, Southwest terminated its relationship with the Construction Union as soon as it was informed that they were to be bound by the Memorandum, and Southwest will not resume its relationship as long as the Union or the Trust assert that Southwest is bound by the Memorandum. Thus, any potential "benefit" for the Construction Union is conditional, inchoate, unripe, and highly speculative. Finally, the Memorandum expired by its terms on June 30, 2016.[75] Under these facts, the Trusts cannot show that the Construction Union's interest in this matter is "direct and immediate."[76]

The Trusts also argue Southwest's Complaint should be dismissed because Southwest's failure to join the Construction Union would prejudice *Southwest*.[77] The Trusts' argument is nothing short of laughable—the Trusts cannot credibly argue that this Court should dismiss Southwest's claim so as to spare Southwest possible hardship from its own pursuit of the lawsuit. One of the few courts that has been presented with a similar argument dismissed it handily, noting that "prejudice to the plaintiff is rarely a consideration since the plaintiff has elected the forum and the parties."[78]

---

[73] *See* California Complaint at 1.
[74] Motion at 7.
[75] *See* Ex. 1 to Motion at Page 008.
[76] *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 407 (3d Cir. 1993); *see also Cortez v. Los Angeles*, 96 F.R.D. 427, 430 (C.D. Cal. 1983) ("mere theoretical possibility of prejudice does not require joinder.") (internal quotation omitted).
[77] *See* Motion at 8 (warning that Southwest could be "subject to a substantial risk of incurring inconsistent obligations").
[78] *A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 414 (S.D. Ga. 1980); *see also* 4 MOORE'S FEDERAL PRACTICE § 19-03 ("Generally, only defending parties need

CORE/3008422.0002/130519316.4

15

**6.     Southwest's claims are not preempted by Section 301 of the LMRA.**

With zero analysis and scant legal authority, the Trusts incorrectly argue that Section 301 of the LMRA preempts the Second Cause of Action ("Doctrine of Reasonable Expectations").[79] The Trusts cite Arizona case law then cite basic cases on preempting without analysis. Not all state-law claims are preempted.[80] Moreover, it is *the Trusts* who interject Arizona law into the conversation; the Complaint does not state—or even imply—that the second cause of action arises exclusively under Arizona law. The doctrine of reasonable expectations is found in both state and *federal common law* and the Ninth Circuit has expressly applied this doctrine to ERISA.[81] Thus, the Second Cause of Action does not necessarily even present state law claims to preempt.

The Trusts' argument regarding the Third Cause of Action is clearly flawed. The Ninth Circuit has repeatedly stated that state statutes of limitation are to be applied in ERISA actions.[82] Accordingly, decisions around the country have held that state statutes of limitations are applicable to—and can time-bar—ERISA actions.[83] In fact, this Court has previously applied Arizona's statute of limitation for wage claims to bar an ERISA claim.[84] If the Trusts' argument held any water, none of these decisions would exist.

The Trusts' preemption argument fails for an additional reason: the Trusts don't actually perform *any* of the required preemption analysis under LMRA Section 301.

---

worry about the imposition of inconsistent or multiple obligations… [P]otential harm to the plaintiff is rarely relevant.").
[79] Motion at 8-9.
[80] *See* footnote 88, *infra*.
[81] *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382 (1994) (doctrine of reasonable expectations relevant to ERISA-governed insurance contracts); *Winters v. Costco Wholesale Corp.*, 49 F.3d 550 (9th Cir. 1995) (evaluating participant's reasonable expectations relating to self-funded ERISA welfare benefit plan).
[82] *See, e.g., Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1184 (9th Cir. 2010); *Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program*, 222 F.3d 643, 646 (9th Cir. 2000).
[83] *See Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000) (ERISA claims barred by state statute of limitations for employment disputes); *Adamson v. Armco, Inc.*, 44 F.3d 650, 652-54 (8th Cir.1995) (ERISA claims barred by statute of limitations for wage claims).
[84] *Blood Systems, Inc., v. Roesler*, 972 F. Supp. 2d 1150, 1156-57 (D. Ariz. 2013) (Arizona's 1-year statute of limitations for employment contracts barred ERISA claim).
CORE/3008422.0002/130519316.4

The Trusts attempts to pass off its quotes from *Allis-Chamlers Corp. v. Lueck* ("inextricably intertwined with consideration of the term of the labor contract")[85] and *Miller v. AT&T Network Sys.* ("[s]ection 301 preempts all state-law causes of action evaluation of which requires interpretation of a labor contact's terms.")[86] as the tests for preemption under Section 301. But the language quoted in the Trusts' motion is not the test, nor anything near it. Even a cursory reading of the *Miller* case shows that the above language was merely *introductory language* regarding Section 301 preemption. The actual test is much more involved:

> In deciding whether a state law is preempted under section 301… a court must consider: (1) whether the CBA contains provisions that govern the actions giving rise to a state claim, and if so, (2) whether the state has articulated a standard sufficiently clear that the state claim can be evaluated without considering the overlapping provisions of the CBA, and (3) whether the state has shown an intent not to allow its prohibition to be altered or removed by private contract. A state law will be preempted only if the answer to the first question is "yes," and the answer to either the second or third is "no."[87]

The Trusts' failure to cite the actual test *from its own cited case* is fatal to its preemption argument. This failure to apply the test precludes them from raising that issue (really for the first time) in their Reply. The Trusts' preemption arguments fail.

**7.  Conclusion**

As shown above, the Trusts' Motion is misleading and fatally flawed. Southwest never agreed to the Memorandum or the Trusts' forum-selection clause, and the forum-selection clause is unenforceable in any event. Arizona has the greatest interest in deciding this case, and Arizona's public policy favors of having the dispute resolved here. Moreover, neither the parties nor the witnesses have any contact with California. The Construction Union is not indispensable to this lawsuit, nor are Southwest's claims preempted. For all these reason, the Trusts' motion should be denied.

---

[85] Motion at 8.
[86] Motion at 10.
[87] *Miller v. AT & T Network Systems*, 850 F.2d 543, 548 (1988).

CORE/3008422.0002/130519316.4

RESPECTFULLY SUBMITTED  9th  day of December 2016.

                                  **STINSON LEONARD STREET LLP**

                    By:  /s/ Javier Torres
                            James E. Holland, Jr.
                            Javier Torres
                            1850 North Central Avenue, Suite 2100
                            Phoenix, Arizona 85004-4584
                            Attorneys for Southwest Industrial Rigging

CORE/3008422.0002/130519316.4

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2016 I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

>Daniel Shanley
>DeCarlo & Shanley
>533 South Freemont Avenue, Ninth Floor
>Los Angeles, California 90071-1706
>dshanley@deconsel.com

/s/ Celia M. Guerrero