# EXHIBIT 1

James E. Holland, Jr. (021826)
Javier Torres (032397)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: james.holland@stinson.com
      javier.torres@stinson.com
Attorneys for HKB, Inc., dba Southwest Industrial Rigging

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| HKB, INC., an Arizona corporation, doing business as SOUTHWEST INDUSTRIAL RIGGING,<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF TRUSTEES FOR THE SOUTHWEST CARPENTER'S SOUTHWEST TRUST; CARPENTERS SOUTHWEST ADMINISTRATIVE CORP.,<br><br>Defendants. | No. 2:16-cv-03799<br><br>**DECLARATION OF JAMES DOUGLAS WILSON** |

I, James Douglas Wilson, declare as follows:

1. I am the Chief Financial Officer of HKB, Inc. I submit this declaration for the sole purpose of supporting Southwest's motion to dismiss this lawsuit based upon *forum non conveniens*.

2. HKB, Inc. is an Arizona corporation doing business in Arizona as Southwest Industrial Rigging ("Southwest"), with its principal place of business at 2802 W. Palm Ln., Phoenix, AZ 85009.

3. Southwest performs construction-related maintenance and repair work at the Palo Verde Nuclear Generating Station just west of Phoenix (the "Power Plant") twice a year for 4-6 weeks at a time.

CORE/3008422.0002/130546549.1

4. Southwest had previously used carpenters provided by the Construction Union to supplement its workforce for the maintenance and repair work at the Power Plant, but Southwest had never been required to sign a long-term union contract.

5. Southwest simply employed the individual Construction Union members on a piecemeal basis, paying the carpenters (and the Funds) for the work actually performed, but having no obligation beyond the temporary work provided at the Power Plant.

6. In mid-2013, Tom Allen, a salesman for Southwest, told his supervisors at Southwest that the Construction Union gave him a document titled "Southwest Regional Council of Carpenters – Carpenters Memorandum Agreement 2012-2016" (the "Memorandum"), which the Construction Union wanted Allen to sign on Southwest's behalf.

7. Because Tom Allen had no experience with such documents, had no authority to sign such documents, and had never seen such documents, Allen asked his supervisors for direction.

8. Allen's supervisors told him he did not have authority to enter such contracts, and indeed Southwest would not agree to the Memorandum.

9. Southwest could not evaluate the issue further because the Memorandum referenced several other documents that Southwest had never seen and did not have access to.

10. In one version of the Memorandum signed by Allen, Allen identified himself as a salesman: *Tom Allen  Sales*.

11. In another version of the Memorandum signed by Allen, Allen identified himself as a "local rep": *Tom Allen – Local Rep*.

12. "Local Rep" is not a title Southwest uses or recognizes.

2

13. Subsequent to Allen's signing of the Memorandum, and still unaware that Allen had signed the Memorandum, Southwest reiterated to Allen that he did not have authority to bind Plaintiff by signing such contracts on Plaintiff's behalf.

14. Consistent with past practices, Southwest paid for all services rendered by the union carpenters, including paying the plaintiff Funds.

15. On information and belief, Southwest's employees are not Construction Union members and do not receive Construction Union benefits.

16. The Funds' demand by itself actually exceeds the value of all services ever provided by the union carpenters for that time period.

17. During the time that Southwest used carpenters provided by the Construction Union, neither the Construction Union nor the Funds ever brought to Southwest's attention any expectation that Southwest was liable for any of the payments that Funds ultimately demanded as a result of the "audits."

18. After the Funds made their demand for additional money, Southwest immediately stopped hiring the union carpenters.

19. On information and belief: Southwest never knew that the union purported to offer a "benefit plan" for company managers; Southwest never knew that the managers would be deemed to be eligible for such benefits; and Southwest did not want the purported benefit plan.

20. I never received the benefits of any Construction Union benefit plan; I never knew I was deemed eligible to receive such benefits; and I never knew such benefits existed.

21. On information and belief, Southwest's managers: never received the benefits of any Construction Union benefit plan; never knew they were deemed eligible to receive such benefits; and never knew such benefits existed.

22. Southwest's principal place of business is in Phoenix, and Southwest has no offices, facilities, or personnel in California.

3

23. Southwest works in the construction industry and has a construction license, but it is only licensed in Arizona, not California.

24. Southwest does not own or lease any property in California.

25. Southwest has no staff in California.

26. Southwest does not have a California bank account, mailing address, post office box, statutory agent, or telephone number, nor does it advertise or otherwise solicit work in California. Southwest has never been party to a lawsuit in California.

27. Southwest works almost exclusively in Arizona.

28. Southwest has four office locations, all of which are in Arizona: two in Phoenix, one in Flagstaff, and one in Tucson.

29. I work and reside in Arizona.

30. Upon information and belief, Messrs. Harry Kent Baker ("Baker") and Scott William Miller ("Miller") work and reside in Arizona.

31. I do not own any property in California.

32. Upon information and belief, Messrs. Baker and Miller do not own any property in California.

33. I do not have a California phone number, address or other contact information.

34. Upon information and belief, Messrs. Baker and Miller do not have a California phone number, address or other contact information.

35. I have no contact with or affiliation with any lawyers, litigants, or witnesses in California.

36. Upon information and belief, Messrs. Baker and Miller have no contact with or affiliation with any lawyers, litigants, or witnesses in California.

37. I have never been party to a lawsuit in California.

38. Upon information and belief, Messrs. Baker and Miller have never been party to a lawsuit in California.

4

39. On information and belief, Tom Allen resides in the Phoenix area.

40. On information and belief, all of Southwest's anticipated party witnesses reside in the Phoenix area: Harry Baker, Owner and President; Mike Madge, V.P. of Operations; James Wilson, CFO; Scott William Miller, Officer; Michael Allen, Aaron Blaha, Thomas Brennan, Ryan Bryant, Daniel Estrada, Gary Goss, Harry Heiden, Robert Jacobi, Tracey Lay, Sam Melendez, Scott Nelson, Gregory Rasko, Robert Shearer, Bradley Bryan, Peter Francis, Curtis Howe, Lemanuel Jim, Paul Sewell, Southwest employees identified by Plaintiff's audit.

41. On information and belief, eight of the twenty-four union members provided to Southwest by the Construction Union reside in Arizona.

42. On information and belief, at the time he signed the Memorandum, Tom Allen was a Southwest employee living in Arizona who did not travel to California to negotiate or sign the Memorandum.

43. Southwest has never engaged the Construction Union to perform any work in California.

44. To the extent possible, Southwest avoids doing business in California due to increased employment and environmental regulations.

45. Only a small fraction of Southwest's heavy equipment could satisfy California's more stringent environmental regulations.

46. Southwest never sought out California workers from the Construction Union —the union merely provided workers to Southwest based on availability.

47. Attached as Exhibit A is a true and correct copy of a letter dated June 4, 2015, which Southwest received from Carpenters Southwest Administrative Corporation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

5

EXECUTED this 9th day of ~~March~~ Dec, 2016 in PHOENIX, Arizona.

By: /s/ James Douglas Wilson

James Douglas Wilson

6

CORE/3008422.0002/130546549.1

# EXHIBIT A



## *Carpenters Southwest Administrative Corporation*

ADMINISTRATIVE OFFICE: 533 S Fremont Ave. • Los Angeles, CA 90071-1706 • Tel: (213) 386-8590 • Toll Free (800) 293-1370
www.carpenterssw.org

June 4, 2015

CERTIFIED MAIL
7015-0640-0006-6056-2101

Southwest Industrial Rigging
2802 West Palm Lane
Phoenix, AZ 85009

Dear Contributing Employer:

On several occasions over the last week, we have attempted to contact you for the purpose of requesting additional records to complete the audit review. Such audits are conducted pursuant to Article I, Paragraph 118 of the Carpenters' Southern California Master Labor Agreement.

List of documents to complete the audit:

1) List of all jobs from 09/2013 – 12/31/2014   4) Payroll journals on all jobs
2) Check register from 09/2013 – 12/31/2014    5) Copies of W2's
3) Arizona State quarterly's

Since we have been unable to reach the contact person, please contact this office no later than five business days from receipt of this letter for the purpose of establishing a mutually convenient date, to provide the documents for the audit.

We request your cooperation. Failure to respond will result in this matter being referred to the Trust Funds' attorney.

Sincerely

Yolanda Duke,
Field Auditor
cc:   Audit File

## SOUTHWEST REGIONAL COUNCIL OF CARPENTERS
## CARPENTERS MEMORANDUM AGREEMENT
## 2012-2016

It is agreed between the undersigned ("Contractor") and the Southwest Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America and its affiliated local unions in the 12 Southern California Counties, namely, Los Angeles, Orange, San Diego, San Bernardino, Riverside, Imperial, Ventura, Santa Barbara, San Luis Obispo, Kern, Inyo and Mono, and the States of Nevada, Arizona, Utah, New Mexico (and parts of West Texas) and Colorado ("Carpenters' Union"), in consideration of services performed and to be performed by Carpenters for the Contractor, as follows:

1.  The Contractor agrees to comply with all the terms, including wages, hours, and working conditions and rules as set forth in the Agreement referred to as the Southern California Carpenters Master Labor Agreement between United General Contractors Association, Inc. (hereinafter the "Association") and the Southwest Regional Council of Carpenters and its affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, dated July 1, 2012, as well as the appropriate Master Agreements covering the States of Nevada, Arizona, Utah, New Mexico and West Texas, and Arizona, and any extensions, renewals or subsequent Master Labor Agreements, and the Agreements establishing: (1) the Southwest Carpenters Pension Trust, dated September 14, 1959; (2) the Southwest Carpenters Health & Welfare Trust, dated February 8, 1955; (3) the Southwest Carpenters Training Fund, dated May 1, 1960; (4) the Southwest Carpenters Vacation Trust, dated April 1, 1962; (5) the Contract Administration Trust Fund for Carpenters-Management Relations, dated October 1, 1986; (6) the Construction Industry Cooperation Committee, dated October 1, 1986; (7) the Acoustical Industry Advancement Fund; (8) the Carpenters Industry Advancement Fund of Southern California, dated September 19, 1972; and (9) the Independent Contractors Grievance and Arbitration Trust, dated September 1, 1980; (10) the Southern Nevada Carpenters Annuity Fund; (hereafter collectively referred to as the "Carpenters Trust Funds") and any amendments, modifications, extensions and renewals of such Agreements and the Trust Agreements and any agreements establishing other benefits or plans negotiated by the Carpenters' Unions and the Contractor Association signatory to such Master Labor Agreement. Except as specifically excluded by this Memorandum Agreement, such Master Labor Agreements and Trust Agreements are specifically incorporated by reference and made a part of this Memorandum Agreement.

2.  The Contractor agrees to pay the Carpenters Trust Funds the sums in the amounts and manner provided for in the Master Labor Agreement and further agrees to be bound by the Trust Agreements and all amendments, modifications, extensions and renewals thereto. The Contractor agrees to make a contribution to the Carpenters' International Training Fund and to the UBC Labor Management Education and Development Fund, as allocated by the Union from negotiated wage increases. These contributions may be collected with the existing contributions to the Carpenters Health & Welfare Trust, the Carpenters Apprenticeship Trust and/or the Carpenters Contractors

1

Cooperation Committee, or other Carpenter funds, as allocated by the Union. The Employer agrees to be bound to the Agreements and Declarations of Trust for the International Funds as they exist and as they may be amended or restated, and to such rules and regulations as adopted by the Trusts. Upon request the employer may receive the latest annual report prepared for the Funds.

3. The Contractor agrees that he does irrevocably designate and appoint the Employers mentioned in the Agreements establishing the various Carpenters Trust Funds along with representatives designated by the United General Contractors, Inc. and the Residential Contractors Association as his attorney-in-fact, for the selection, removal and substitution of Trustees or Directors as provided by or pursuant to the Master Labor Agreement and Trust Agreements and By-Laws.

4. The parties agree that the provisions of paragraphs 114 and 115 and 601.6 and the provisions relating to Existing and Other Agreements (Article XII) of the Master Labor Agreement will be excluded from this Memorandum Agreement and will not be binding upon the Contractor or the Carpenters' Unions.

5. There has been established under this Agreement and the Master Labor Agreement, an Independent Contractors Grievance and Arbitration Trust. The Contractor and the Carpenters Union agree to submit all disputes, including jurisdictional disputes, concerning the interpretation or application of this Agreement and the Master Labor Agreement to arbitration under this Section 5, and the Contractor and the Carpenters Union agree that during the pendency of the grievance and arbitration procedure, the Carpenters' Unions will not strike or withdraw services and the Contractor will not engage in a lockout; provided, however, the Carpenters Union shall have the right to engage in a strike or withdrawal of services and the Contractor may engage in a lockout on a claimed violation of this Agreement or the Master Labor Agreement relating to the payment of wages or contributions to any Trust Fund referred to in this Agreement or failure to comply with a final and binding arbitration award, except as to any provision or arbitration award on subcontracting.

6. The Contractor agrees that in the event the Contractor contracts or subcontracts any carpenter's work, and in the event that such subcontractor fails to pay the wages or the fringe benefits provided under the Agreements between the subcontractor and the Carpenters' Unions, then the Contractor will become liable for the payment of such sums incurred by the subcontractor, and such sums will immediately become due and payable by the Contractor. Such payments will be measured by the hours worked or paid for by the employees of the subcontractor. The Trustees of the Trust Funds referred to in the Master Labor Agreement and this Memorandum Agreement are expressly made third party beneficiaries of the Contractors' promise to make such payments. The Trustees of the Trust Fund referred to in the Master Labor Agreement and this Memorandum Agreement, will have the right to require any Contractor that is a party to this Memorandum Agreement, to post a cash or surety bond in an amount sufficient to safeguard the payment of Trust Fund Contributions that are required to be paid to the Trust Funds in accordance with the Master Labor Agreement.

2

7. Except as specifically excluded by this Memorandum Agreement, the Carpenters Union and the Contractor agree to abide by all the terms and conditions of the Master Labor Agreement(s) and Trust Agreements and any amendments, modifications, changes, extensions and renewals, including changes in wages, benefits, term, coverage, geographic scope or any other changes to such agreements.

8. Preservation of Unit Work:

(a) In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Contractor performs any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Contractor (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) ownership, management or control, the terms and conditions of this Agreement will be applicable to all such work.

(b) All charges of violations of Subsection (a) of this paragraph, will be considered as a dispute under this Agreement and will be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in this Agreement. As a remedy for violations of this paragraph the arbitrator is empowered at the request of the Carpenters Union, to require an employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations. Provisions for this remedy does not make such remedy the exclusive remedy available to the Carpenters Union for violations of this paragraph; nor does it make the same of other remedies unavailable to the Carpenters Union for violation of this paragraph.

(c) If, as a result of violations of this paragraph 8, it is necessary for the Carpenters Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with subsection (b), or to defend an action which seeks to vacate such award, the Contractor will pay any accountants' and attorneys' fees incurred by the Carpenters Union and/or fund trustees, plus cost of the litigation, which have resulted from the bringing of such court action.

(d) If this paragraph 8 is declared to be unlawful, the parties will negotiate similar language that will give the Carpenters Union equivalent protection.

9. The Contractor and the Carpenters Union expressly acknowledge that on the Contractor's current jobsite work, the Carpenters Union has the support of a majority of the

employees performing work covered by this Agreement. The Union has demanded and the Contractor has recognized the Carpenters Union as the majority representative of its employees performing work covered by this Agreement. It is also acknowledged that the Union has provided, or has offered to provide, evidence of its status as the majority representative of the Contractor's employees. By this acknowledgment the parties intend to and are establishing a collective bargaining relationship under Section 9 of the National Labor Relations Act of 1947, as amended. The bargaining unit established by this Agreement and the Master Labor Agreement is accepted by the parties as an appropriate unit for collective bargaining purposes.

10. Each individual Employer signatory hereto specifically waives any right that he or it may have to terminate, abrogate, repudiate or cancel this Agreement during its term or during the term of any future modifications, changes, amendments, supplements, extensions, or renewals of or to said Master Labor Agreement, or to file any petition before the National Labor Relations Board seeking to accomplish such termination, abrogation, cancellation or repudiation or to file a petition seeking clarification or redefinition of the bargaining unit covered by this Agreement.

11. Notwithstanding any provision of the Master Labor Agreement or this Agreement, the individual employer agrees that upon a showing by the Union or any of its affiliates a majority of the individual employer's shop employees, if any, have designated the Union and/or any of its affiliates as their representative for collective bargaining purposes, the individual employer shall recognize the Union and/or its affiliates as the collective bargaining representative of its shop employees and shall forthwith comply with all wages, hours, terms and conditions of the then current Store Fixture Agreement for the term thereof. Proof of such majority representation shall be established by the submission of authorization cards to a neutral third person who shall compare the signatures with appropriate employer records. The individual employer shall fully cooperate in such review upon demand by the Union or any of its affiliates.

12. The Contractor agrees that in the event it performs any work within the jurisdiction of the United Brotherhood of Carpenters in the geographical jurisdiction of the Southwestern Regional Council of Carpenters (although subject to change it is currently the States of Nevada, Arizona, Utah, New Mexico (and parts of West Texas), Colorado and 12 Southern California Counties) the Contractor shall perform all such work pursuant to the appropriate Carpenters Master Agreement for that area, including but not limited to the hiring hall and subcontracting requirements contained in said Agreements.

13. This Memorandum Agreement shall remain in full force and effect for the period of the term of the Carpenters Master Labor Agreement between United General Contractors Association, Inc. (hereinafter the "Association") and the Southwest Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, dated July 1, 2012, and for the term of any successor Master Labor Agreement(s) and does hereby authorize the Association to represent the Contractor, unless either party shall give written notice by registered or certified mail to the other of desire to change or cancel this

4

Memorandum Agreement at least sixty (60) days, but no earlier than ninety (90) days, prior to June 30, 2016, or if such notice is not given, than at least sixty (60) days, but no earlier than ninety (90) days prior to the termination date of a successor Master Labor Agreement. All notices given by the Carpenters Union to the signatory Contractor Association to the Master Labor Agreement shall constitute sufficient notice to the Contractor by the Carpenters' Unions; provided, however, that a notice to the Contractor Association by either party shall not constitute sufficient notice of such intent not to be bound by a new Agreement or renewal or extension of the Master Labor Agreement and Trust Agreements.

Dated 8/22/13

**CONTRACTOR:**

Southwest Industrial Rigging
Firm Name (Print Exactly as Listed with State License Board)    State License No.

BY: Tom All                    Tom Allen    Sales
(Signature of Contractor)      (Print name and title of person signing)

2802 W Palm Lane    Phoenix    Az    85009
Address              City,      State,  Zip

6028821805                      tallen@SWIRUSA1.com    200
Phone Number    Fax Number    e-mail address    No. of Employees

Specific type of work you perform with your OWN work force:

Cranes, machinery moves, heavy haul, Rigging
Service

General Contractor _____    Subcontractor _____    Both _____

**SOUTHWEST REGIONAL COUNCIL OF CARPENTERS**
MIKE McCARRON, Executive Secretary

BY:_____
Signature of Authorized Union Representative    Print Name and Local No.
Memoagree2012
06-17-2012

5

## ARIZONA MILLWRIGHTS
## EFFECTIVE SEPTEMBER 1, 2012

**BENEFITS:**

| | | |
|---|---|---|
| Pension | $3.66 | |
| Health & Welfare | 5.45 | |
| Vacation/Supplemental Dues | 4.53 | (Vacation $3.36; dues $1.17) |
| Annuity | 2.00 | |
| Apprenticeship | .68* | (Includes Drug Testing and Industry Fund) |
| LMCF | .06 | |
| **Total to Carpenters Trusts** | $16.38 | |
| AMEAP | .25 | (paid directly to AMEA) |
| **Total Benefit Contributions** | $16.63 | |

Pension, Vacation and Annuity contributions are subject to the applicable overtime rates.

| PERIOD | PERCENTAGE | WAGE RATE |
|---|---|---|
| 1st 6 Months | 50% | 14.59 |
| 2nd 6 Months | 55% | 16.05 |
| 3rd 6 Months | 60% | 17.51 |
| 4th 6 Months | 65% | 18.97 |
| 5th 6 Months | 70% | 20.43 |
| 6th 6 Months | 75% | 21.89 |
| 7th 6 Months | 80% | 23.34 |
| 8th 6 Months | 85% | 24.80 |
| 9th 6 Months | 90% | 26.26 |
| 10th 6 Months | 95% | 27.72 |
| Journeyman Millwright | 100% | 29.18 |
| Millwright Welder | | 29.18 |
| Foreman (10% above Journeyman) | | 32.10 |
| General Foreman (10% above foreman) | | 35.31 |

**NOTE:** The vacation and supplemental dues contributions are to be added to the employee's wages, taxed and withheld and submitted to the Trust Funds.

The Apprenticeship contribution of $0.68 includes Apprenticeship ($0.53) and contributions to the Millwright Cooperation Committee -"Drug Testing" ($0.10) and the UBC Millwrights Labor-Management Industry Promotion Fund ($0.05)

Per Diem at the rate of $45.00 per day will be will be paid to all employees on any job which is 51 miles or more from the City Hall of Phoenix, 200 W. Washington St. Phoenix, Arizona 85003 to the center of the jobsite.

**Wage Re-openers** September 1st of 2013, 2014, 2015 and 2016